UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRIS HENRY SMITH | ) | CASE NO.: 09-10314(1)(7) |
| Debtor(s) | ) | |
| | ) | |
| BLUEGRASS STOCKYARDS OF | ) | AP NO.: 09-1022 |
| CAMPBELLSVILLE, LLC | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHRIS HENRY SMITH | ) | |
| Defendant(s) | ) | |

**MEMORANDUM-OPINION**

This matter came before the Court for trial on March 24, 2010. The Court considered the written submissions of the parties, the documentary evidence, the testimony presented at trial and the arguments of counsel for both parties. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. Judgment in favor of the Plaintiff accompanies this Memorandum-Opinion.

**FINDINGS OF FACT**

Plaintiff Bluegrass Stockyards of Campbellsville, LLC (" BSC") is an organization which runs auctions of cattle. Local sellers bring their stock to the stockyards for sale and in the event they are not purchased promptly, BSC buys the leftover cattle to hold temporarily and to later resell at auction. This process is designed to assist local sellers and to keep prices at a stable level. According to federal law, BSC cannot profit from these in-house purchase/resale transactions.

Debtor Chris Henry Smith ("Debtor") had been one of the owners of Taylor County Stockyards ("TCS") during 2006 and sold his interest in TCS to BSC in late 2006. Thus BSC is the successor by purchase of TCS and its operations. By January 2007, BSC hired Debtor as its manager. Debtor's duties included overseeing the day to day activities of the stockyard, including the sales at cattle auctions held at BSC and upkeep of the stockyard.

Debtor was familiar with the Bluegrass Purchase Account ("BPA") and its legal limitations both as a prior owner of the predecessor entity and by virtue of his status as manager of BSC. Jim Akers, the CEO of BSC, told Debtor from the outset of his employment with BSC that if he used the BPA to purchase cattle for any entity other than BSC, he had to clear-up the account immediately. While Debtor was authorized to use the BPA to purchase and sell cattle for his own purposes, he had to pay for them that day or within a day or two. The delay in payment however put the owners of BSC in a financial predicament.

Debtor owns, with his wife Kelly, Green River Land and Cattle Company ("Green River"). For all practical purposes, Green River and Debtor are one and the same. No stock was ever issued for Green River. Debtor and his wife paid all of their household expenses, their mortgage and health insurance premiums out of the Green River corporate account. No corporate meetings were ever held on behalf of Green River. Kelly apparently did something with the books of the company, but to the world, Green River was Debtor. He handled everything to do with the cattle, wrote the checks for the company and was in charge of the day to day operations of the company.

Debtor regularly bought cattle at the BSC auctions for Green River while using the BPA. Debtor testified that from January 2007 to September 2007, he purchased between $1,000,000 and $1,500,000 in cattle for Green River. Debtor often failed to pay for cattle purchased for Green River

using the BPA the same day purchased. Akers testified that he told Debtor it was inappropriate to use the BPA as a trading account, which was the actual result of Debtor's purchases but nonpayment for cattle for more than a few hours. He testified that he reprimanded and spoke with Debtor on numerous occasions for using the BPA to purchase cattle on behalf of Green River. In addition to its Campbellsville location, BSC owns several stockyards. Its largest stockyard is in Lexington, Kentucky. The Lexington stockyard sells much more cattle than Campbellsville, yet the Campbellsville BPA always ran at a much higher amount than any of its other locations, indicating heavy employee personal use.

The significance of the improper use is that if cattle are sold using the BPA rather than to a conventional paying buyer, the owners of BSC would have to contribute new capital to the company to cover payment to the sellers for their stock. BSC was not in the business of owning cattle for more than a few hours and then only to protect the market. If Debtor, whether in his name or that of Green River, bought the cattle using the BPA and did not pay for it, BSC owners would pay the sellers and be owed a receivable from Green River or whomever was the transferee of the cattle. Essentially, Debtor's inappropriate use of the BPA was forcing the owners of BSC to finance Debtor's Green River cattle operations which was a violation of federal law and subjecting the owners of BSC to financial hardship and potentially severe losses.

On September 15, 2007, BSC held a cattle auction at its facility. Debtor admitted that he purchased 162 head of cattle at that auction on the BPA. Debtor claimed he purchased the cattle for BSC. Later on the same date as the auction, the record shows that Debtor directed Jeanine Pruitt, the Office Manager of BSC, to transfer the cattle purchased on the BPA to Green River. As had become Debtor's practice, he did not promptly pay for the cattle purchased on September 15, 2007.

Akers did not become aware of the receivable due BSC from Debtor/Green River until Monday morning, September 17, 2007 when he reviewed the sale records. Akers then realized he needed to borrow money to pay the sellers of the 162 head of cattle sold on the prior Saturday as neither Debtor or Green River had paid for the cattle that day. Further, Akers telephoned the Chairman of the Board of BSC, i.e., his boss, about the unpaid purchase, the borrowing necessary to cover the checks written to the sellers and Debtor's latest transgression. In the phone call, Akers received authority to terminate Debtor's employment. Akers then notified Debtor later that morning by phone that his employment had been terminated. Akers later learned that the 162 head of cattle were not on the stockyards property and had apparently disappeared between the close of business on Saturday September 15, 2007 and Monday morning September 17, 2007.

Debtor testified that he had no idea what happened to the 162 head of cattle purchased on the BPA on September 15, 2007 and that he did not take them from the stockyards premises. He testified that they were on the stockyard grounds when he left work on September 15, 2007. Debtor also testified that he delayed payment for the cattle because he was outraged at his termination from BSC. Debtor claimed that he paid BSC for all the cattle he purchased for Green River on the BPA except for the $45,000 in dispute in the case. He also claimed that BSC should know where the cattle went since it was in control of the stockyard premises.

BSC claims the cattle were taken from its premises after hours during the remaining part of the weekend after the close of business on September 15, 2007. It suggests that Debtor could have driven the cattle to his parents' farm which is just a fence away from the stockyards. A knowledgeable cattleman could have easily dismantled part of the fence, driven the cattle to

Debtors' parents' property and trucked them to parts unknown thereafter without raising an eyebrow in the community. Debtor denies that he had any part in such a plan.

      BSC records also show that Debtor through Green River ordered significant veterinary care for the cattle on the stockyard's premises on September 15, 2007. An invoice from the September 15, 2007 contains charges for 154 head of cattle doctored by Keith Andrews, D.V.M. The invoice was submitted by Dr. Andrews to Green River. Debtor contends that these cattle were not the ones purchased on the BPA at the auction on September 15, 2007, but were another set of cattle that he had previously bought (and paid for in November 2007 after suit was filed) and then brought from the Green River farm to the stockyard on September 15, 2007. He claims the cattle were in good shape and he wanted them vaccinated before he resold them on behalf of Green River.

      Dr. Andrews testified that it would have been unusual for Debtor to bring cattle in from his own farm to be doctored on the day of a BSC cattle auction. The invoice shows that on September 15, 2007, Dr. Andrews gave the cattle the antibiotic draxxin. The drug's purpose was to keep the cattle from getting sick. If cattle had been put out to pasture then brought in to be doctored and were in good shape, it would be unusual to give them draxxin due to its expense at that time. He did testify, however, that if cattle were purchased at a sale with the intent to be resold in a short time, it would be common to give cattle draxxin to keep them from getting ill. BSC's theory is that Green River already had a potential buyer for the cattle or it would not have had this level of care administered to the cattle at that particular time.

      The barn manager at BSC testified that all cattle that were sold at the September 15, 2007, auction were doctored by Dr. Andews. No outside cattle were brought in to be doctored by Dr.

Andrews. He testified it would have been unusual to have 150 head of cattle brought in to be doctored on the same date as a BSC auction.

Jeanine Pruitt testified that at the end of the sale on September 15, 2007 there were 162 head of cattle listed on the BPA and that $45,000 is still owed on this purchase. That was an unusually large dollar amount for BSC to carry on its accounts. On September 15, 2007, there were eight pages of change orders from one account to another. If there was to be a resale of the cattle within two or three days, there would have been no change tickets on the date of the sale.

On February 23, 2009, Debtor filed his Voluntary Petition seeking relief under Chapter 7 of the United States Bankruptcy Code. On Schedule F to his Petition, Debtor listed an unsecured nonpriority claim owed to BSC in the amount of $72,416.08.

On May 20, 2009, BSC initiated this adversary proceeding seeking a judgment declaring the debt owed to BSC by Debtor nondischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) and (a)(4).

## LEGAL ANALYSIS

BSC filed this adversary proceeding against Debtor contending he owes them $45,074.60, plus post-petition interest, late charges, attorneys' fees and court costs. BSC further wants the debt declared nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A) because Debtor's actions constituted a debt for money, property or services obtained by false pretenses, false representations or actual fraud; and 11 U.S.C. §523(a)(4)(A) because Debtor's actions constituted a debt for fraud while acting in a fiduciary capacity or a debt for embezzlement or larceny. The Court will review the claims in light of the entire record.

A.  11 U.S.C. §523(a)(2)(A).

In order to except a debt from discharge under 11 U.S.C. §523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representations; and (4) the creditor's reliance was the proximate cause of the loss.  In re Rembert, 141 F.3d 277, 281 (6th Cir. 1998).  The claimant must show that the property was obtained by false representation, false pretense or actual fraud, but a showing of only one of these is required.  In re Rapp, 375 B.R. 421 (Bankr. S.D. Ohio 2007).  The objecting creditor bears the burden of proof to establish the debt is of a type excepted from discharge.  In re Molino, 225 B.R. 904, 907 (B.A.P. 6th Cir. 1998).

Whether a debtor had the requisite fraudulent intent to warrant an exception to discharge under 11 U.S.C. §523(a)(2)(A) is a subjective inquiry.  Field v. Mans, 516 U.S. 59, 70-72 (1995). Fraudulent intent may be established by direct, as well as circumstantial, evidence.  In re Horton, 372 B.R. 349 (Bankr. W.D. Ky. 2007).

The evidence presented at trial establishes that BSC carried its burden of proof on each required element of §523(a)(2)(A).  The Debtor gained property, cattle, by purchasing them through the BPA for either his own personal profit or that of Green River.  The Debtor knew that at the time he made the purchase that Green River would later sell the cattle on its own account for profit.  BSC relied on Debtor's representations as the manager of its stockyard that he would not use the BPA as a trading account.  BSC's reliance on Debtor's actions and statements were reasonable based on past dealings with Debtor, his position as manager of the stockyard and this reliance was the

-7-

proximate cause of its loss of $45,074.60. The debt is nondischargeable under 11 U.S.C. §523(a)(2)(A).

    B. 11 U.S.C. §523(a)(4).

BSC's Complaint also asserts a claim against Debtor to have the debt declared nondischargeable pursuant to 11 U.S.C. §523(a)(4). This section of the statute makes any debt excepted from discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." In re Patel, 565 F.3d 963 (6th Cir. 2009). BSC's claim is based on its theory that the Debtor's actions constituted fraud while acting in a fiduciary capacity, as well as constituting embezzlement or larceny.

A debt is nondischargeable as a result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss. In re Bucci, 493 F.3d 635, 642 (6th Cir. 2007). For nondischargeability purposes, the Sixth Circuit construes the term "fiduciary capacity" more narrowly than the term is used in other circumstances. Id. Its application is limited to express or technical trusts and does not apply to implied trusts imposed by operation of law or a matter of equity. Id.; In re Johnson, 691 F.2d 249, 251-52 (6th Cir. 1982). It does not apply to someone who fails to meet an obligation under a common law fiduciary relationship. See, In re Garver, 116 F.3d 176 (6th Cir. 1997) ("the attorney-client" relationship, without more, is insufficient to establish the necessary fiduciary relationship for defalcation under 11 U.S.C. §523(a)(4)).

Here, the facts do not establish an express or technical trust. While Debtor may have owed a fiduciary duty to BSC as the manager, that duty was not established based on an express or technical trust. Thus, BSC's claim based on fiduciary capacity under 11 U.S.C. §523(a)(4) fails.

The term "fiduciary capacity", however, does not modify "embezzlement" or "larceny" in 11 U.S.C. §523(a)(4). In re James, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984). The debt could be nondischargeable on the grounds of embezzlement or larceny without a finding of a fiduciary relationship. In order to succeed on a claim of embezzlement, BSC had to prove that (a) the Debtor appropriated funds for his own benefit and (b) he did so with fraudulent intent or deceit. Both elements are necessary and may be proved by circumstantial evidence. Id. To succeed on a claim of larceny, BSC had to show Debtor wrongfully and with fraudulent intent took property from its owner. In re Smith, 2010 WL 323429 (Bankr. W.D. Ky. 2010).

The trial evidence established that Debtor purchased cattle for Green River with the BPA. Despite having been repeatedly told not to do so, Debtor then instructed that the records be changed to reflect that Green River purchased the cattle. Debtor did not pay for the cattle and the circumstantial evidence supports the conclusion that Debtor moved the cattle from BSC's stockyard to his parents' farm next door. The Court concludes that Debtor wrongfully and with fraudulent intent took BSC's property and failed to pay the resulting debt of $45,074.60. Accordingly, the evidence supports the finding of nondischargeability based on embezzlement and/or larceny pursuant to 11 U.S.C. §523(a)(4).

Finally, Debtor claims that if BSC's claims are correct, the Debtor's actions were on behalf of Green River. Under Kentucky law, the corporate veil may be pierced and the Debtor held individually liable under the "alter ego" theory or the "instrumentality" theory. Under the alter ego theory, BSC had to prove (1) that the corporation was not only influenced by the owners, but also that there was such a unity of ownership and interest that their separateness ceased to exist; and (2)

that treatment of the separate corporate existence would sanction a fraud or promote injustice. White v. Winchester Land Development Corp., 584 S.W.2d 56, 61 (Ky. App. 1979).

Under the "instrumentality" theory, BSC had to prove (1) that the corporation was a mere instrumentality of the shareholder; (2) that the shareholder exercised control over the corporation in such a way as to defraud or harm the plaintiff; and (3) that a refusal to disregard the corporate entity would subject the plaintiff to unjust loss. Id.

Many courts regard the theories interchangeable because the elements are basically the same. Dwyer v. ING Inv. Co., Inc., 889 S.W.2d 902, 904-05 (Mo. App. 1994). The evidence established that Debtor and his wife completely disregarded the corporate form of Green River and used it as a mere instrumentality for their own personal expenses. Under either theory, the corporate veil of Green River should be pierced and Debtor held personally liable for the debt.

## **CONCLUSION**

For all of the above reasons, the Court will enter Judgment in favor of the Plaintiff Bluegrass Stockyards of Campbellsville, LLC on its Complaint to have the debt of Debtor Chris Henry Smith declared nondischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) and (a)(4).

# UNITED STATES BANKRUPTCY COURT
# FOR THE
# WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRIS HENRY SMITH | ) | CASE NO.: 09-10314(1)(7) |
| Debtor(s) | ) | |
| | ) | |
| BLUEGRASS STOCKYARDS OF CAMPBELLSVILLE, LLC | ) | AP NO.: 09-1022 |
| Plaintiff(s) | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHRIS HENRY SMITH | ) | |
| Defendant(s) | ) | |

## JUDGMENT

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of the Plaintiff Bluegrass Stockyards of Campbellsville, LLC against Defendant/Debtor Chris Henry Smith and that the debt in the amount of $45,074.60 is declared nondischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) and (a)(4).

This is final and appealable Judgment there is no just reason for delay.